1
2
3
4
5
6
7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN V. WHITE, | Case No.  1:12-cv-00603-SAB |
| Plaintiff, | ORDER DENYING PLAINTIFF'S SOCIAL SECURITY APPEAL |
| v. | (ECF Nos. 10, 12, 14) |
| COMMISSIONER OF SOCIAL SECURITY, | |
| Defendant. | |

**I.**

**INTRODUCTION**

Plaintiff John V. White ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying his application for disability benefits pursuant to the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to Magistrate Judge Stanley A. Boone.[1]

Plaintiff suffers from degenerative disc disease and depression.  For the reasons set forth below, Plaintiff's Social Security appeal shall be denied.

---

[1] The parties have consented to the jurisdiction of the United States Magistrate Judge.  (See ECF Nos. 6, 11.)

1

## II.

### FACTUAL AND PROCEDURAL BACKGROUND[2]

Plaintiff initially filed for disability insurance benefits on September 6, 2002, and following a hearing held on June 28, 2004, Plaintiff was found not to be disabled within the meaning of the Social Security Act.  (AR 59.)  Plaintiff filed an appeal in the United States District Court for the Eastern District of California which was dismissed on January 30, 2007, at the stipulation of the parties.[3]  White v. Commissioner of Social Security, 1:06-cv-00007-OWW-DLB (E.D. Cal.).

In the instant action, Plaintiff protectively filed an application for a period of disability and disability benefits on June 27, 2007.  (AR 20.)  Plaintiff's application was initially denied on January 31, 2008, and denied upon reconsideration on April 16, 2008.  (AR 82-85, 87-91.)  Plaintiff requested and received a hearing before Administrative Law Judge Sandra K. Rogers ("the ALJ"), which took place on April 7, 2009.  (AR 35-54.)  On March 5, 2010, the ALJ found that Plaintiff was not disabled.  (AR 17-28.)  The Appeals Council declined Plaintiff's request for review on February 18, 2012.  (AR 1-4.)

### A.    Hearing Testimony

Plaintiff is fifty five years old, has been married for thirty-nine years, and has two daughters, ages thirty-eight and thirty-six.  (AR 42, 45.)  Plaintiff stated that he saw a goat and pig that were talking and threatening him in his bedroom and were irritants.  (AR 43.)  Plaintiff wears sunglasses to hide from everyone.  (AR 43-44.)  Plaintiff is seen once a month by a Workmen's Compensation ("Workmen's Comp.") doctor, Dr. Stanford, for treatment of his injuries.  (AR 44.)

Plaintiff last worked for Sherlock Auto Plaza and sustained a groin and back injury when he slipped in oil for which he filed a Workmen's Comp. claim.  (AR. 42.)  Plaintiff complains that

---

[2] Citations to the Social Security Administrative Transcript will be designated as "AR" (administrative record).  (See ECF No. 7.)

[3] The action was dismissed because, after a thorough review of the transcript, Plaintiff's counsel came to the conclusion that the claim lacked merit.  White v. Commissioner of Social Security, 1:06-cv-00007-OWW-DLB (E.D. Cal. Jan. 30, 2007).

he cannot do anything because if he is on his feet longer than fifteen minutes his groin starts burning, and his feet and upper back hurt.  (AR 44.)  Plaintiff stated that his hand was hurting during the hearing.  (AR 44.)

Mr. Detmer, a vocational expert ("VE"), also testified at the hearing.  (AR 45-53.)  Mr. Detmer characterized Plaintiff's prior work as an auto mechanic, DOT 620.261-010, Medium, SVP 7.  (AR 45.)  The VE was asked to opine about the job prospects of an individual with several hypothetical limitations.  First, the VE was asked a hypothetical with the following limitations:

- A person the same age, education, and work experience as Plaintiff;
- Moderately limited in the ability maintain attention and concentration for extended periods of time;
- The ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances;
- The ability to work in coordination with or proximately to others without being distracted by them;
- The ability to complete a normal work day and work week without interruption from psychological-based symptoms;
- The ability to accept instructions and respond appropriately to criticisms from supervisors; and
- The ability to get along with co-workers or peers without distracting them.

(AR 45-46.)

The VE opined that this individual would not be able to perform Plaintiff's past relevant work.  (AR 46.)  The VE was then presented with a hypothetical in which the person was able to understand and remember work instructions and simple procedures; can maintain concentration and attention for two hour increments on a sustained basis in a low demand setting; and is able to relate to others in a limited contact, non-public setting, and was asked if there would be other jobs existing in the national or regional economy which the person could perform at the medium level.  (AR 46.)  The VE opined that this individual could not work as an auto mechanic.  (AR 46.)  The

1   VE clarified that it would be a low-stress hands on kind of job where concentration would be in

2   two hour increments to meet those restrictions. (AR 46-47.) This individual could work as a

3   kitchen helper, about 14,000 jobs in California; hand packager, about 14,000 jobs in California;

4   or an auto detailer, about 15,000 jobs in California. (AR 47.)

5       The VE was given a hypothetical with a person with the same age, education, and work

6   experience as claimant; capable of only light work; with the same mental limitations previously

7   given. (AR 47.) The VE opined that an individual with those limitations only able to work at a

8   light level would be able to perform routine repetitive types of work, such as a mail clerk, about

9   10,000 jobs available; production assembler, 10,000 jobs in California; or a cannery worker,

10  about 10,000 jobs in California. (AR 48.)

11      Plaintiff's counsel then presented a hypothetical to the VE of an individual with marked

12  restriction of activities of daily living; marked difficulties maintaining social functioning; marked

13  difficulties in maintaining concentration, persistence and pace; and three episodes of

14  decompensation for an extended entry. (AR 51.) The VE opined that there would be no jobs

15  available for this individual. (AR 51.)

16      The ALJ noted that there were documents in the record that he did not have access to and

17  he would review them prior to issuing his decision. (AR 52.)

18  **B.      The ALJ's Findings**

19      Since Plaintiff's previous claim was denied on August 13, 2004, the ALJ made the

20  following findings of fact and conclusions of law for the period from August 14, 2004, through

21  December 31, 2006. (AR 21.) The ALJ found that:

22  • Plaintiff last met the insured status requirements of the Social Security Act on December

23      31, 2006;

24  • Plaintiff did not engage in substantial gainful activity during the period from his alleged

25      onset date of August 14, 2004 through his date of last insured of December 31, 2006;

26  • Plaintiff has the following severe impairments:  degenerative disc disease and depression;

27  • Plaintiff did not have an impairment or combination of impairments that met or medically

28      equal one of the listed impairments;

4

1   • Plaintiff had the residual functional capacity to perform light work except that he is
2       limited to understanding, remembering and carry out simple job instructions. Plaintiff is
3       also limited in the ability to respond appropriately to others and should have limited
4       contact with co-workers in a non-public setting;
5   • Plaintiff is unable to perform past relevant work;
6   • Plaintiff was fifty-three years old, which is defined as an individual closely approaching
7       advanced age, on the date last insured;
8   • Plaintiff has marginal education and is able to communicate in English;
9   • Transferability of job skills is not material to the determination of disability because the
10      claimant is not disabled;
11  • There were jobs that exist in significant numbers in the national economy that Plaintiff
12      could perform; and
13  • Plaintiff was not under a disability as defined in the Social Security Act from August 14,
14      2004 through December 31, 2006.
15  (AR 23-28.)

16  **III.**

17  **LEGAL STANDARDS FOR JUDICIAL REVIEW OF**
    **SOCIAL SECURITY DETERMINATIONS**
18

19      An individual may obtain judicial review of any final decision of the Commissioner of
20  Social Security regarding entitlement to benefits. 42 U.S.C. § 405(g). The Court "reviews the
21  Commissioner's final decision for substantial evidence, and the Commissioner's decision will be
22  disturbed only if it is not supported by substantial evidence or is based on legal error." Hill v.
23  Astrue, 698 F.3d 1153, 1158 (9th Cir. 2012). "Substantial evidence" means more than a scintilla,
24  but less than a preponderance. Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996) (internal
25  quotations and citations omitted). "Substantial evidence is 'such relevant evidence as a
26  reasonable mind might accept as adequate to support a conclusion.'" Id. (quoting Richardson v.
27  Perales, 402 U.S. 389, 401 (1971)). "[A] reviewing court must consider the entire record as a
28  whole and may not affirm simply by isolating a specific quantum of supporting evidence." Hill,

698 F.3d at 1159 (quoting <u>Robbins v. Soc. Sec. Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)). However, it is not this Court's function to second guess the ALJ's conclusions and substitute the Court's judgment for the ALJ's.   <u>See</u> <u>Burch v. Barnhart</u>, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.")

**IV.**

**DISCUSSION AND ANALYSIS**

Plaintiff raises three arguments in his opening brief: 1) the ALJ erred because the finding of credibility is not supported by substantial evidence but is solely based upon a false reading of the record and speculation; 2) the ALJ failed to give the proper weight to the medical opinions; and 3) at the fifth step, the ALJ failed to prove there are an adequate number of jobs in the regional and national economy which Plaintiff could perform because she failed to ask a proper hypothetical based upon Plaintiff's educational skill and disabilities.[4]  (Opening Brief 8, ECF No. 10.)

**A.     The ALJ's Credibility Finding is Supported by Substantial Evidence**

Plaintiff alleges that the ALJ erred by making an adverse credibility finding based upon Plaintiff's non-compliance with medical advice, apparent drug seeking behavior, and the prior abandonment of counsel in Plaintiff's original appeal.  (ECF No. 10 at 9.)  Defendant argues that the finding that Plaintiff's complaints were not credible is supported by the fact that Plaintiff's treatment during the relevant period was limited and conservative, his lack of compliance with medical treatment, and his admission in the prior proceeding that his claim lacked merit.  (Opp. to Plaintiff's Opening Brief 7-8, ECF No. 12.)

Determining whether a claimant's testimony regarding subjective pain or symptoms is credible requires the ALJ to engage in a two-step analysis.  <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  The ALJ must first determine if "the claimant has presented objective

---

[4] Plaintiff does not appeal the ALJ's finding that his exertional impairments do not preclude Plaintiff from performing a full range of light work.  (ECF No. 10 at 2.)  Therefore, the Court will not address the findings regarding Plaintiff's degenerative disc disease other than to discuss Plaintiff's complaints of pain as it relates to the credibility finding.

1   medical evidence of an underlying impairment which could reasonably be expected to produce

2   the pain or other symptoms alleged." Lingenfelter, 504 F.3d at 1036 (internal punctuation and

3   citation omitted).  This does not require the claimant to show that his impairment could be

4   expected to cause the severity of the symptoms that are alleged, but only that it reasonably could

5   have caused some degree of symptoms.  Smolen, 80 F.3d at 1282.

6         Second, if the first test is met and there is no evidence of malingering, the ALJ can only

7   reject the claimant's testimony regarding the severity of his symptoms by offering "clear and

8   convincing reasons" for the adverse credibility finding.  Carmickle v. Commissioner of Social

9   Security, 533 F.3d 1155, 1160 (9th Cir. 2008).  The ALJ must specifically make findings that

10  support this conclusion and the findings must be sufficiently specific to allow a reviewing court to

11  conclude the ALJ rejected the claimant's testimony on permissible grounds and did not arbitrarily

12  discredit the claimant's testimony.  Moisa v. Barnhart, 367 F.3d 882, 885 (9th Cir. 2004) (internal

13  punctuation and citations omitted).

14        Factors that may be considered in assessing a claimant's subjective pain and symptom

15  testimony include the claimant's daily activities; the location, duration, intensity and frequency of

16  the pain or symptoms; factors that cause or aggravate the symptoms; the type, dosage,

17  effectiveness or side effects of any medication; other measures or treatment used for relief;

18  functional restrictions; and other relevant factors.  Lingenfelter, at 1040; Thomas, 278 F.3d at

19  958.  In assessing the claimant's credibility, the ALJ may also consider "(1) ordinary techniques

20  of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements

21  concerning the symptoms, and other testimony by the claimant that appears less than candid;

22  [and] (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed

23  course of treatment. . . ."  Tommasetti v. Astrue, 533 F.3d 1035, 1039 (9th Cir. 2008) (quoting

24  Smolen, 80 F.3d at 1284).

25        The ALJ's decision notes that the August 13, 2004 decision found that Plaintiff lacked

26  credibility as the subjective allegations were not supported by the objective medical findings.

27  (AR 23.)  The ALJ found that Plaintiff's medically determinable impairments could have been

28  reasonably expected to produce the alleged symptoms, but that Plaintiff's statements regarding the

intensity, persistence, and limiting effects of the symptoms were not entirely credible.  (AR 26.)  The ALJ noted that Plaintiff's treatment for his alleged disabling impairments was routine and conservative in nature.  (AR 26.)  Plaintiff admitted that he was not compliant in taking his prescribed medication, which suggests that the symptoms are not as limiting as alleged.  (AR 26.)  Plaintiff also admitted to significant substance abuse, including marijuana and the use of any prescription narcotic pain medication that he could obtain.  (AR 26.)  The ALJ found most disturbing that Plaintiff stipulated to dismiss his prior action due to lack of merit.  (AR 26.)  The ALJ found that these reports are an inconsistency bearing on credibility and do not support Plaintiff's complaints of disabling pain, and indicate that, at the least, he is exaggerating his limitations.  (AR 26.)  As discussed below, the ALJ's credibility finding is supported by substantial evidence in the record.

      1.     Plaintiff's Lack of Compliance With Medical Treatment and Substance Abuse

Plaintiff has been complaining of back pain due to numerous industrial injuries dating back to at least 1987.[5]  (AR 232.)  On September 1, 1988, Dr. Vizcarra noted that Plaintiff refused certain medications and trigger point injections, demanding Vicodin, which was denied.  (AR 312.)  On October 17, 1988, Dr. Madsen received a call from the Modesto Back School advising him that Plaintiff had missed four of five appointments.  (AR 337.)

On September 10, 1990, Plaintiff advised Dr. Johnston that his wife was giving him Vicodin.  Dr. Johnston recommended physical therapy, but Plaintiff wanted Vicodin so he could continue to work.  (AR 312.)  Dr. Barker noted on April 14, 1992 that Plaintiff wanted more Vicodin.  (AR 241.)

On February 22, 1994, and April 26, 1994 Plaintiff refused injections or other aggressive intervention.  (AR 241-42.)  On November 1, 1994, Plaintiff told Dr. Rhodes that he needed ten Vicodin a day to manage his pain and declined an epidural injection.  Plaintiff complained that physicians under treat pain.  (AR 242, 313.)

By 1995, Plaintiff was using over 20 Vicodin per day.  (AR 266.)  On June 23, 1997,

---

[5] Plaintiff's medical records reflect complaints of back pain dating back to 1981.  (AR 234.)

Plaintiff informed Dr. Gesson that he did not want injections, but wanted a physician who would mix up medicines to make his pain go away.  (AR 243, 313.)  On June 23, 1997, Dr. Gesson noted that Plaintiff was using 70 Vicodin a week for pain.  (AR 275.)  In August 1997, Plaintiff went through drug detoxification for opiate dependence.  (AR 243.)  On September 10, 1997, Plaintiff saw Dr. Chan who recommended injections and wrist splints for pain.  Plaintiff refused the wrist splints and stated he would think about having injections.  (AR 349.)

On August 5, 1998, Dr. Provenzano noted that Plaintiff had been taking Vidocin like drugs since 1986 and now wanted detoxification.  Plaintiff was taking 400 tablets of Lorcet monthly.  (AR 275, 314.)  In August 1998, Plaintiff went to Doctor's Hospital for detox, but only stayed two days.  Plaintiff wanted to return home to smoke marijuana.  He began using drugs shortly after leaving the program.  (AR 275, 314.)  On August 20, 1998, Dr. Barker indicated that Plaintiff was continuing to deal with hydrocodone withdrawal.  (AR 275.)

On September 14, 1999, Plaintiff had both legs casted due to "severe pain in plantar aspects of both feet."  (AR 350.)  Although the cast therapy was to last six weeks, Plaintiff removed the casts on October 10, 1999.  (AR 350-51.)  On December 27, 1999, Plaintiff saw Dr. Rollins.  Plaintiff refused physical therapy and claimed intolerance to all anti-inflammatory medications.  (AR 243.)

In 2001, Plaintiff was referred to physical therapy for his lower back, but only attended three to four times.  (AR 232.)  On February 12, 2001, Dr. Barker noted that Plaintiff was using his wife's Xanax to calm him down.  (AR 274, 315.)  On April 16, 2001, Dr. Barker noted that Plaintiff wanted to get completely off Vicodin and was planning to investigate a detox center in Southern California.  (AR 315.)  On September 3, 2001, Dr. Rollins noted that Plaintiff stated physical therapy only made him feel worse saying, "I ain't doing no stinking exercises.  Every time I got to therapy, they mess me up."  (AR 353.)  On September 14, 2001, Dr. Rollins noted that many aspects of Plaintiff's exam were consistent with symptoms amplification.  (AR 244, 353.)

On October 30, 2001, Plaintiff saw Dr. Rollins and stated he did not want surgery unless he had a 100 percent guarantee that he would get better.  (AR 245.)  On November 1, 2001,

1    Plaintiff informed Dr. Emery that he did not want injections or discography.  (AR 245, 355.)  On

2    November 16, 2001, Dr. Rollins noted that Plaintiff's subjective complaints are out of proportion

3    to objective findings and are consistent with cumulative trauma predating current work injury on

4    July 23, 2001.  (AR 246.)  On December 4, 2001, Plaintiff presented to Dr. Rollins wanting a

5    refill of Vicodin.  Dr. Rollins recommended a non-narcotic alternative to Vicodin with therapy

6    and injections.  Plaintiff declined injections or surgical procedures and was not interested in

7    alternative treatments.  (AR 246, 356.)  On December 8, 2001, Dr. Rollins noted that Plaintiff had

8    symptoms consistent with narcotic addition, declined alternative treatment and only wanted

9    hydrocodone.  (AR 247, 357.)  By the time Plaintiff left his job in 2001, he was using over 50

10   Vicodin per day.  (AR 267.)

11       On January 2, 2002, Plaintiff saw Dr. Barker who discussed Plaintiff's depression and

12   addiction.  (AR 247.)  From January 7, 2002, through January 11, 2002, Plaintiff attended a rapid

13   detoxification program due to opioid dependence.  (AR 258, 267.)  When he entered this

14   program, Plaintiff was using an average of 350 to 380 Vicodin or other types of narcotic

15   analgesics per week.  (AR 268.)  In a report dated February 14, 2002, Dr. Drucker stated that

16   Plaintiff "testified about far more opioid use than he admitted to me.  He acknowledged obtaining

17   opioids not only from various physicians but also purchasing drugs off the street.  Although he

18   falsified the extent of his use of Vicodin/Lorcet during our meeting, I was sufficiently concerned

19   to discuss the matter with his wife and to diagnose Opioid Dependence."  (AR 317.)

20       On March 21, 2002, Dr. Rollins noted that he recommended several medications, but

21   Plaintiff stated that nothing helped him and he would not submit to invasive procedures.  (AR

22   358.)  An April 15, 2002 letter from Dr. Rollins indicates that Plaintiff was complaining that his

23   back pain is worsening, he has pain in his right hip and numbness down the posterior aspect of his

24   right leg, persistent burning in the left groin and reports that he sits in a chair crying the majority

25   of his time.  (AR 221.)  However, the doctor noted that "[h]e walks through the examination room

26   with no limp and appears in no pain at all.  He is able to sit comfortably."  (AR 221.)

27       On August 12, 2002, Dr. Rollins noted that Plaintiff requested Percocet, OxyContin or

28   morphine.  Dr. Rollins was unwilling to prescribe narcotic medications, and Plaintiff was

unwilling to try cortico-steroid injections or physical therapy.  (AR 360.)

On March 25, 2003, Dr. Drucker wrote a supplemental report in which he indicated that he saw Plaintiff on October 25, 2001, and Plaintiff told him that he limited himself to marijuana and his wife was regulating his use of Vicodin.  However, Dr. Drucker discovered that Plaintiff was using sufficient opioids that he underwent detoxification after their meeting.  (AR 288.) Additionally, Plaintiff indicated a more extensive arrest history during a subsequent meeting with Dr. Goldfield than he acknowledge during the evaluation with Dr. Drucker.  (AR 288.)

On March 31, 2003 Plaintiff received a bladder and renal ultrasound that were negative. Dr. Dewar found no urologic basis for Plaintiff's discomfort and his obstructive symptoms were not that severe.  (AR 224.)  On April 9, 2003, Dr. Bailie recommended wound exploration and removal of mesh to see if Plaintiff had a neuroma.  Plaintiff indicated he would think about it, but did not appear to wish to proceed with the treatment.  (AR 225.)  On May 27, 2003, Plaintiff was seen by Dr. Jensen for foot pain and was seeking narcotic pain management.  Dr. Jensen noted he had nothing further medically or surgically to offer Plaintiff.  (AR 363.)

In a report dated May 4, 2004, Dr. Chittenden noted that Plaintiff was supposed to have a urine test to check for diabetes and he did not have the test performed.  (AR 331.)  Dr. Chittenden further noted that Plaintiff has a plethora of subjective complaints that have not always been supported by hard objective findings.  He concluded that there is evidence based upon his examination of Plaintiff and other doctor's notes that Plaintiff would have them believe he is more disabled than he really is.  (AR 369.)  Dr. Chittenden stated that Plaintiff has had pain seeking behavior for many, many years.  (AR 370.)

On September 14, 2004, Plaintiff had a psychological examination in which Dr. McKitrick stated Plaintiff was unusually uncooperative throughout the examination.  During the examination, he stopped to take a medication that he identified as Xanax.  (AR 373.)  Plaintiff was never fully engaged and did not appear to be making his best efforts.  (AR 373-74.)  Thus, Dr. McKitrick stated the results of the testing were likely to be a low estimate of Plaintiff's current level of functioning.  (AR 374.)  For this evaluation, Plaintiff was also seen by Dr. Lipsett.

In a report dated January 3, 2005, Dr. Lipsett reported that Plaintiff admitted that he gets his own pain medication, morphine or OxyContin because the doctors will not prescribe medication for him.  (AR 482.)  Plaintiff stated that he had been drug free since the early 1980s and smokes two joints a day as well as taking Xanax.  (AR 487.)  Plaintiff told Dr. Lipsett that after he started taking the Vicodin he was not taking it for pain, but so he would not go through withdrawal.  He got Vicodin by buying it on the street.  Plaintiff stated it was possible his withdrawal was making him tell untruths to the doctors so he could get Vicodin.  He took OxyContin to keep from going through withdrawal.  At the time Plaintiff stopped taking Vicodin, he was using 380 pills every two weeks.  (AR 491.)

On October 2, 2005, Plaintiff was seen by Dr. Gwinup who noted that Plaintiff stated he was allergic to nonsteroidals and refused muscle relaxers for back pain.  (AR 383-84.)

On September 26, 2006, Plaintiff was examined by Dr. Brar and admitted to smoking four to five joints each evening.  Plaintiff said that he suffered from withdrawal symptoms including irritability, distractibility and having a difficult time getting things done when he does not get his joints.  Plaintiff was using cocaine every four to five months, and last used cocaine one week prior to the appointment.  Plaintiff stated that he was using morphine, OxyContin, and Vicodin when it is available to him and he has been using it almost on a daily basis in the morning.  (AR 388.)  On November 2, 2006, Plaintiff told Dr. Brar that he was not taking his medication because it was a waste of time.  He denied using any drugs, other than having a single joint each evening. [6] (AR 392.)

Dr. Drucker interviewed Plaintiff for his Workmen's Comp. claim.  In a report dated November 12, 2001, Plaintiff denied hallucinations.  (AR 301.)  In this same interview, Plaintiff denied any prior lawsuits or worker's compensation claims and acknowledged filing bankruptcy about four years prior.[7]  (AR 303.)  However, on October 6, 2007, Plaintiff was examined by Dr.

---

[6] The reports by Dr. Brar are included within the administrative record twice.  (See AR 386-394 and 395-403.)

[7] Although Plaintiff denied any prior lawsuits or Workmen's Comp claims, Plaintiff was awarded permanent disability and future medical care as a result in 1987 for an injury at Patchetts Motors.  He also received a permanent disability award for an injury while employed with George's Auto Service.  (AR 232, 490, 552-53.)

1    Scaramozzino and during the examination Plaintiff stated that he had been having hallucinations

2    of a goat and a pig since the late 1990s and he had never filed for bankruptcy.  (AR 405-06.)

3          On April 16, 2002, during an examination by Dr. Goldfield, Plaintiff denied any history of

4    emotional illness or drug abuse in his family.  (AR 269.)  However, during his interview with Dr.

5    Brar on September 26, 2006, he stated that his mother has been using Valium "forever" and his

6    brother and two sisters have all used drugs in the past.  (AR 389.)

7          Reviewing the record as a whole, it is replete with evidence that would support the

8    conclusion that Plaintiff was non-compliant with medical advice and exhibited drug seeking

9    behavior.  While Plaintiff argues that the attempts to obtain pain medication demonstrate that his

10   complaints of pain were credible, Plaintiff conceded the possibility that his withdrawal was

11   making him tell untruths to the doctors so he could get Vicodin.  The record clearly demonstrates

12   that Plaintiff had a severe addiction to opioids and sought detoxification on at least three separate

13   occasions.  Each time that Plaintiff went through a detoxification program, Plaintiff began using

14   narcotic drugs again.  As late as September 26, 2006, Plaintiff admitted to Dr. Brar that he was

15   using morphine, OxyContin, and Vicodin when it is available to him and he had been using it

16   almost on a daily basis in the morning.

17         On multiple occasions, Plaintiff refused the recommended conservative treatment stating

18   that he was only interested in narcotic pain medications.   Additionally, treating physicians

19   indicated that Plaintiff was exaggerating his symptoms, and there are medical observations in the

20   record that Plaintiff's subjective allegations were not supported by the objective medical findings.

21         Finally, while Plaintiff's treatment of his medical conditions has extended over a long

22   period of time, the treatment has been limited and conservative.  There is substantial evidence in

23   the record to support the ALJ's determination regarding Plaintiff's credibility and finding that the

24   medical records do not support Plaintiff's complaints of disabling pain and indicate that, at the

25   least, he was exaggerating his limitations.

26         2.     Stipulation to Dismiss Prior Action

27         Plaintiff also alleges that the ALJ erred by making an adverse credibility determination

28   based upon the abandonment of counsel in Plaintiff's original appeal.  The ALJ found it most

13

1    disturbing that Plaintiff stipulated to dismiss his prior action due to lack of merit.

2           On December 30, 2005, Plaintiff filed an appeal regarding the denial of Social Security

3    benefits in the Eastern District of California.   White, No. 1:06-cv-00007-OWW-DLB.   On

4    December 29, 2007, a stipulation and proposed order was filed by the parties dismissing the

5    action.  White at ECF No. 22.  The stipulation states " [a]fter thorough review of the transcript,

6    Plaintiff's counsel comes to the conclusion this claim lacks merit to continue.  Plaintiff's counsel

7    has conferred with Plaintiff and both are in agreement to dismissal."  Id. at 1.

8           In light of the other reasons the ALJ gave for Plaintiff's lack of credibility, there is

9    substantial evidence supporting the credibility determination.   Accordingly should there have

10   been any error by the ALJ in considering the stipulation to dismiss the prior action in determining

11   Plaintiff's credibility, it would be harmless.  McLeod v. Astrue, 640 F.3d 881, 888 (9th Cir. 2011)

12   (applying harmless error standard).

13          **B.       The ALJ Did Not Err by Failing to Give Controlling Weight to the Opinion of
                       Dr. Stanford**
14

15          Plaintiff also alleges that the ALJ did not give controlling weight to Dr. Stanford's

16   opinions which is consistent with six other physicians who treated or evaluated Plaintiff.  Plaintiff

17   contends that Dr. Levinson's opinion overlooked or ignored reports showing recurrent or repeated

18   psychological episodes.  (ECF No. 10 at 10.)  Defendant contends that there was no error because

19   Dr. Stanford's opinion relied on Plaintiff's subjective complaints and he did not clearly understand

20   the difference between Social Security disability, which concerns the ability to perform work, and

21   Worker's Compensation disability, which concerns the ability to perform previous work.  (ECF

22   No. 12 at 11.)

23          It is the responsibility of the ALJ to determine credibility and resolve conflicts in medical

24   testimony.  Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989).  As a general rule, the ALJ

25   is to give more weight to the opinion of a treating source than to the opinions of physicians who

26   do not treat the claimant.  Turner v. Commissioner of Social Sec., 613 F.3d 1217, 1222 (9th Cir.

27   2010).  The opinion of an examining physician is entitled to more weight than the opinion of a

28   nonexamining physician.  Lester, 81 F.3d at 830.  The ALJ must provide clear and convincing

1   reasons to reject the opinion of a treating or examining physician that is not contradicted by

2   another physician.  Id.; Turner, 613 F.3d at 1222.  The opinion of a treating or examining doctor,

3   even if contradicted by another doctor, can only be rejected for "specific and legitimate reasons

4   supported by substantial evidence in the record."  Lester, 81 F.3d at 830-31.  "The opinion of a

5   nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection

6   of either an examining physician or a treating physician."  Id. at 831.

7        The ALJ gave substantial weight to the assessments of the State Agency medical

8   consultants, and gave little weight to the assessments from the treating physicians because they

9   "relied quite heavily on the subjective report of symptoms and limitations provided by the

10   claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported."

11   (AR 26).  Additionally, the ALJ stated that "[i]t is also not clear that the treating professionals

12   were familiar with the definition of disability contained in the Social Security Act and

13   regulations."  (AR 27.)  The ALJ hypothesized that the doctor was referring solely to Plaintiff's

14   ability to perform his past work.  (AR 27.)

15        Plaintiff last met the insured status requirements on December 31, 2006.  (AR 23.)  To be

16   entitled to benefits, Plaintiff must establish disability on or before December 31, 2006.  (AR 20.)

17   In considering Plaintiff's claim, the ALJ considered the period of time from August 14, 2004

18   through December 31, 2006, to determine if there was evidence of a changed circumstance in

19   Plaintiff's medical condition.  (AR 21.)

20        The key issue in this case was whether Plaintiff had been disabled before his insurance

21   coverage ended on December 31, 2006.  Accordingly, the medical evidence shall be reviewed to

22   determine the status of Plaintiff's medical condition on or before December 31, 2006.  Given the

23   central importance of the timing of Plaintiff's disability in the agency's decision, this Court was

24   surprised at how little evidence and testimony presented below addressed Plaintiff's condition in

25   the time period running from August 14, 2004 to the end of his period of insurance eligibility.

26        1.    Dr. Chittenden

27        Dr. Chittenden examined Plaintiff regarding his complaints of foot pain and submitted a

28   report dated May 4, 2004.  (AR 324-371.)  Plaintiff was taking Norco, morphine, and Xanax.

(AR 328.)   Plaintiff complained of joint stiffness, morning stiffness, muscle weakness, sore muscles, muscle twitches, muscle pains and cramps, night pain, numbness and tingling and burning sensations, loss of balance, falling spells, tension headaches, vision difficulties, moodiness, feelings of tension, trouble sleeping, poor coordination, and forgetfulness.  (AR 328.)

Dr. Chittenden performed a physical examination and asked Plaintiff to get x-rays and blood tests done.  Plaintiff was very resistant stating it would cause him pain to have to remove his footwear and jeans again.   X-rays were taken and the results showed "normal radiographs bilateral feet" and "normal radiographs of bilateral ankles."  (AR 331, 372.)

Dr. Chittenden reviewed Plaintiff's medical file.   (AR 331-368.)   Dr. Chittenden determined that Plaintiff's foot condition was permanent, stationary and ratable.  (AR 368.)  Dr. Chittenden found that Plaintiff had a plethora of subjective complaints that have not always been supported by hard objective findings.  (AR 369.)  Plaintiff subjective foot complaints were found to be frequent to constant and minimal to light with most activities and would appear to increase to slight and constant with more vigorous activities.  (AR 369.)  Dr. Chittenden determined a rating of 25 percent for Plaintiff's bilateral foot problems was very generous.  In his opinion, there had been no increase in his disability rating over the prior two years and with regard to his foot problems, Plaintiff was not a "Qualified Injured Worker."  (AR 369.)

Dr. Chittendon stated that he was

amazed at how [his] colleagues ignore psychological aspects of patients' illnesses. Clearly Mr. White has had pain seeking behavior for many, many years.  With regard to his feet, he seems to have found a podiatrist who is more than willing to attach a diagnosis and recommend surgery when it should be readily apparent that there is nothing in the way of any vigorous treatment that is going to help this gentleman.  We should all be thankful that Mr. White did not have tarsal tunnel surgery.  The results of this poorly conceived surgery in general is poor, even in patients who have valid symptoms.  If Mr. White had had this surgery, I can almost guarantee the he would be much worse than he is now.  With regard to the Cortisone injections Mr. White received, he is fortunate that he didn't have some major side effects from these Cortisone injections.  As one might expect, the injections did nothing.  He does not need medications for his foot pain.

(AR 370.)

2.     Dr. McKitrick/Dr. Lipsett

On September 14, 2004, Dr. McKitrick conducted a psychological examination of

Plaintiff.  (AR 373-376.)  Dr. McKitrick noted that Plaintiff was unusually uncooperative during the examination.  During the examination, Plaintiff stopped to take Xanax stating that otherwise he would "blow up pretty quickly."  (AR 373.)  Plaintiff was never fully engaged and did not appear to be making his best efforts; and Dr. McKitrick stated that the results of the test are likely to be a low estimate of Plaintiff's current level of functioning.  (AR 374.)

During the intellectual testing, Plaintiff scored in the borderline range on vocabulary, Block Design, and Digit Span testing.  Plaintiff scored in the mentally deficient range on Arithmetic and Picture Arrangement tests.  Dr. McKitrick stated that Plaintiff's "disinterested and even antagonistic attitude toward this evaluation, in combination with the already detrimental effects of anxiety and depression, make it very difficult to estimate a probable baseline for his intellectual level. . .  Although he failed to achieve a cognitive score in the low average range, it appears probable on the basis of this evaluation and review of his life history that he generally functions in the borderline to low-average range of cognitive ability."  (AR 374.)

Dr. McKitrick used the BID, a widely-used self-report instrument, to determine the severity of depression.  She found that although "the BID is extremely 'face valid'; that is, examinees can manipulate their scores if they wish to,. . . it appears likely that Mr. White is experiencing very severe depression at this time."  (AR 374.)

Dr. McKitrick found that "[h]is guarded and barely superficially cooperative attitude to the evaluation make firm conclusions difficult, especially with regard to his cognitive ability.  He appears to function in the borderline to low-average intellectual range."  While Plaintiff appeared to be severely depressed, he was reluctant to admit his depression directly.  Dr. McKitrick found that Plaintiff will not be very open to psychological treatment.  "Mr. White has stated that he wants very much to return to work, and a supportive vocational rehabilitation program could help him attain that goal as well as stabilize his emotional functioning."  (AR 376.)

Dr. Lipsett found Plaintiff to be oriented to time, place and person.  He was dysthymic and tearful on occasion.  He had difficulties with concentration, memory, and judgments.  His conceptual thinking varied from fair to concrete.  Plaintiff was unable to do serial sevens, but could do serial tens.  He did not show hallucinations, delusions or paranoid thinking, but did

17

exhibit symptoms of depressions, such as problems sleeping, problems with appetite, and diminished libido.  (AR 487.)

Upon review of the medical records and evaluation of Plaintiff, Dr. Lipsett found Plaintiff's condition to be permanent and stationary on a psychiatric basis, and that he became permanent and stationary in mid-2002.  (AR 557.)  Plaintiff's disability from his injury was light to occasionally moderate on a psychiatric basis.  (AR 557.)  Plaintiff was unable to return to his usual and customary occupation on a psychiatric basis.  (AR 558.)

### 3.    Dr. Bayless

Plaintiff was seen by Dr. Bayless for major depression, recurrent, severe with psychotic features.  On February 25, 2005, Plaintiff had his initial appointment with Dr. Bayless.  Plaintiff complained of visual hallucinations of a talking pig and a goat that just stares.  Plaintiff stated that sometimes he just blows-up and chases the pig.  (AR 380.)  On March 15, 2005, Plaintiff reported hallucinations of a talking pig and goat.  Plaintiff complained of chronic pain and wanted to be treated with "certain meds."  (AR 379.)  On March 22, 2005, Plaintiff stated that he sees a pig and a goat.  (AR 378.)  On April 1, 2013 Plaintiff claimed that he was having visual hallucinations.  Plaintiff complained of chronic pain and lack of specific pain medications that he wanted.  (AR 377.)   The treatment plan at all of these visits was behavioral and cognitive psychological counseling.

### 4.    Dr. Gwinup

On October 2, 2005, Plaintiff presented to the Emanuel Medical Center with back pain.  Plaintiff was found to have mild tenderness over the lumbosacral area, with decreased range of motion.  Plaintiff declined muscle relaxers and nonsteroidals.  (AR 383-84.)

### 5.    Dr. Brar

Plaintiff was evaluated by Dr. Brar on September 26, 2006.  (AR 386-91.)   Plaintiff complained of occasional crying spells, cried easily, very distracted with decreased energy, and had isolated himself for eight days with anhedonia and on and off feelings of helplessness and hopelessness.  (AR 386.)  Plaintiff stated that he had been having these bouts of depression on a monthly basis and during the periods of depression he sees demons.  He stated he used to see

demons all the time.  Plaintiff said that he has seen a goat and pig in the past and heard mumbling voices, but had not had any of these experiences lately.  (AR 387.)  Plaintiff also reported panic attacks.  (AR 387.)

Dr. Brar found Plaintiff to be alert and oriented with poor attention to grooming.  He was cooperative and engaging, with restricted affect.  Plaintiff's concentration was good and memory was within normal limits.  Speech was articulate with normal rate and rhythm.  Plaintiff denied any current hallucinations.  Thought process seemed coherent.  Plaintiff did not appear to be internally stimulated and insight and judgment were fair in regards to chronic pain and mood symptoms, but very limited in context of his substance abuse.  (AR 390.)  Dr. Brar discussed the effects of chronic pain pills and marijuana use on mood with Plaintiff; however Plaintiff was in significant denial.  Plaintiff was to continue using Xanax, and to see a counselor.  (AR 391.)

Plaintiff was seen by Dr. Brar on November 2, 2006.  Plaintiff complained of panic attacks and pain, but denied depression, crying episodes, feelings of helplessness or hopelessness, or hallucinations.  (AR 392.)  Plaintiff was referred to a pain clinic and had been prescribed anti-seizure medications for his pain, but was not taking his medications.  (AR 392.)  Plaintiff was alert and oriented with a restricted affect.  Concentration was fair and insight limited.  (AR 392-93.)  Dr. Brar discussed Plaintiff's limited cooperation and lack of insight issues.  Plaintiff was advised to quit using marijuana, but he declined.  (AR 393.)

6.    Dr. Reddy

On January 14, 2008, Dr. Reddy issued a case analysis finding that there was insufficient evidence to determine residual function capacity prior to date last insured.  (AR 425.)

7.    Dr. Levinson

Dr. Levinson conducted a mental residual functional capacity assessment on January 28, 2008.  (AR 426-442.)  Dr. Levinson assessed Plaintiff from August 14, 2004, through December 13, 2006.  (AR 426.)  Dr. Levinson found Plaintiff's restriction of activities of daily living were mild; difficulties in maintaining social functioning, and concentration, persistence, or pace were moderate; and there had been no episodes of decompensation of extended duration.  (AR 436.)  Dr. Levinson noted that there were minimal records from August 14, 2004, through December 13,

2006.  (AR 437.)  Dr. Levinson found that Plaintiff was able to understand and remember work locations and simple procedures; maintain concentration and attention for two hour increments on a sustained basis in a low-demand setting; could relate to others in a limited contact, non-public setting; and was able to travel, avoid hazards, and respond to change.  (AR 442.)

8.   Subsequent Medical Records

On April 25, 2007, Plaintiff was seen by Dr. Stanford who stated that is was too early to provide a precise diagnosis, and found Plaintiff had mood disorder, not otherwise specified.  (AR 453.)   On February 25, 2008, Dr. Stanford wrote a note stating that Plaintiff has been psychiatrically disabled with psychotic features, severe, since 1996.  (AR 455.)  Dr. Stanford conducted a mental residual functional capacity assessment of Plaintiff for the period of April 25, 2007, through March 25, 2009.  (AR 570-585.)  Dr. Stanford found Plaintiff's limitations in restriction of activities of daily living, maintaining social functioning, maintaining concentration, persistence, and pace to be marked.  Dr. Stanford also found three periods of decompensation of extended duration.  (AR 580.)

Plaintiff was seen by Dr. Scaramozzino on October 6, 2007, who made findings based upon Plaintiff's psychological conditions.   Plaintiff's ability to understand and remember instructions, to maintain concentration and attention, to accept instructions from a supervisor and respond appropriately, and to deal with various changes in the work setting was fair.  (AR 408-09.)  Plaintiff's ability to sustain an ordinary routine without supervision was good.  Plaintiff's ability to complete a normal workday/workweek without interruptions was fair to poor at this time.  Ability to interact with co-workers was poor.  (AR 409.)

9.   Analysis

From August 14, 2004, through December 31, 2006, Plaintiff was evaluated by Dr. McKitrick, Dr. Lipsett, Dr. Bayless, Dr. Brar, and Dr. Levinson.  Dr. Levinson is the only physician during that time period who evaluated Plaintiff's residual functional capacity.  He found that Plaintiff was able to understand and remember work locations and simple procedures; maintain concentration and attention for two hour increments on a sustained basis in a low-demand setting; could relate to others in a limited contact, non-public setting; and was able to

1    travel, avoid hazards, and respond to change.  (AR 442.)

2          Dr. Lippsett found that Plaintiff did exhibit symptoms of depressions, such as problems

3    sleeping, problems with appetite, and diminished libido.  (AR 487.)  While Plaintiff argues that

4    the medical records show a worsening of Plaintiff's mental condition, in September 2004 Dr.

5    Lippsett found that Plaintiff's mental condition had been permanent and stationary since mid-

6    2002.  (AR 557.)  Additionally, Dr. Lipsett found Plaintiff's psychiatric disability from his injury

7    to be light to occasionally moderate.  (AR 557.)  Finally, while Dr. Lipsett found that Plaintiff

8    was unable to return to his usual and customary occupation on a psychiatric basis, his report does

9    not preclude the ability to work in other occupations, and Dr. McKitrick found that a supportive

10   vocational rehabilitation program could help Plaintiff attain his goal of returning to work, as well

11   as stabilize his emotional functioning   (AR 558, 376.)

12         Plaintiff argues that the ALJ should have adopted the findings of Dr. Stanford because he

13   was Plaintiff's treating physician.  Plaintiff's period of disability ended on December 31, 2006,

14   and he did not begin seeing Dr. Stanford until April 2007.  While medical evaluations made after

15   the expiration of Plaintiff's insured status are relevant to the evaluation of a preexisting condition,

16   Smith v. Bowen, 849 F.2d 1222, 1226 (9th Cir. 1988), Dr. Stanford's finding that Plaintiff was

17   suffering from a marked disability was for the time period of April 25, 2007 through March 25,

18   2009, which is not the relevant period for Plaintiff's Social Security claim.  Further, although Dr.

19   Stanford wrote a note stating that Plaintiff has been psychiatrically disabled with psychotic

20   features, severe, since 1996, his findings were made mainly relying on what Plaintiff told him.

21   (AR 161); see Tommasetti, 533 F.3d at 1041 ("An ALJ may reject a treating physician's opinion

22   if it is based 'to a large extent' on a claimant's self-reports that have been property discounted as

23   incredible").

24         As discussed above the ALJ did not err in finding that Plaintiff was not credible in relating

25   his alleged symptoms.  A review of the medical record shows that Plaintiff began complaining of

26   depression in 1999.  (AR 244.)  Further, Plaintiff stated that he started to feel very depressed by

27   1999.  (AR 267.)  On March 8, 1999, Plaintiff informed Dr. Barker that he had some depression.

28   (AR 315.)  The medical records only include a rare mention of depression or anxiety prior to

1    2001.  Accordingly, the ALJ did not err by not adopting finding of Dr. Stanford.

2          During the relevant time period, Plaintiff was treated by Dr. Bayless on four occasions

3    and Dr. Brar on two occasions.  Dr. Bayless did not set forth any objective findings or limitations

4    upon Plaintiff's ability to work.  During Plaintiff's visits with Dr. Brar, Plaintiff denied any

5    hallucinations and was found to be alert and oriented with restricted affect.  Concentration and

6    judgment was fair and insight limited as to Plaintiff's substance abuse issues.  None of these

7    findings are contrary to the functional capacity assessment of Dr. Levinson, nor does this limited

8    treatment show a worsening or amplification of Plaintiff's condition.

9          Plaintiff argues that the ALJ should have used the determination of work functions found

10   at page 477 of the administrative record, which, applying the Workmen's Compensation formula,

11   would result in a finding of 50 percent disability under the Workmen's Compensation system.

12   The item referenced by Plaintiff are the findings of level of impairment for the specific areas

13   considered by Dr. Lipsett.  These findings show that Plaintiff's limitations in his ability to

14   comprehend and follow instructions, ability to make generalizations, evaluation or decisions

15   without immediate supervision, and ability to accept and carry out responsibility for direction,

16   control and planning are slight.  The limitations on Plaintiff's ability to relate to other people

17   beyond giving and receiving instructions and ability to influence people are minimal.  The

18   limitations on Plaintiff's ability to perform simple and repetitive tasks are slight to moderate.  The

19   limitations on Plaintiff's ability to maintain a work pace appropriate to a given work load and

20   ability to perform complex and varied tasks is moderate.  (AR 477.)  An ALJ is "not bound by an

21   expert medical opinion on the ultimate question of disability."  Tomasetti, 533 F.3d at 1041.  The

22   ALJ considered the findings of Dr. Lippsett and those findings are not inconsistent with the ALJ's

23   determination regarding Plaintiff's residual functional capacity.

24         The ALJ did not err by adopting the limitations set forth by Dr. Levinson.

25   **C.      The ALJ Did Not Err At Step Five in Finding a Substantial Number of Jobs
             Existed in the Economy That Plaintiff Could Perform**
26

27         Plaintiff claims that the ALJ did not demonstrate that there were other jobs that Plaintiff

28   could perform because he did not consider all of Plaintiff's impairments.  The functional capacity

1   limitations found by Dr. Levinson are the limitations the ALJ gave to the VE in the second

2   hypothetical.  While Plaintiff alleges that the ALJ erred because the VE was not specifically

3   advised of Plaintiff's age, education, and work experience, the VE was present during the hearing

4   in which Plaintiff testified that he was fifty five years of age.  (AR 45.)  Further, the VE stated

5   that Plaintiff was employed as an auto mechanic for many years, so he was aware of Plaintiff's

6   work experience.  (AR 45.)

7        To the extent that the hearing record does not specifically state Plaintiff's educational

8   background, it is harmless error and would not warrant reversal in this instance.  "[H]armless

9   error applies in the Social Security context."  Stout v. Commissioner, Social Sec. Admin., 454

10  F.3d 1050, 1054 (9th Cir. 2006).  Harmless error occurs where the error does not prejudice the

11  claimant, and no reasonable ALJ could have reached a different disability determination.  Stout,

12  497 F.3d at 1056.  The record shows that Plaintiff completed the eighth grade and Dr. McKitrick

13  found that Plaintiff "generally functions in the borderline to low-average range of cognitive

14  ability."  (AR 374.)  The hypothetical provided by the ALJ specified that the individual would be

15  able to understand and remember work instructions and simple procedures; this is not

16  inconsistent with Plaintiff's educational level or the findings of Dr. Levinson, Dr. Lipsett, or Dr.

17  McKitrick.

18       Plaintiff also argues that the VE was not informed of Dr. Levinson's specific findings in

19  the areas in which Plaintiff was moderately limited.  Those findings were taken into

20  consideration by Dr. Levinson in making the ultimate determination of Plaintiff's functional

21  capacity assessment.  For example, Dr. Levinson determined that Plaintiff's ability to maintain

22  attention and concentration for extended period and ability to complete a normal workweek

23  without interruptions from psychologically based symptoms and to perform at a consistent pace

24  without an unreasonable number and length of rest periods was moderately limited.  Therefore,

25  Dr. Levinson determined that Plaintiff was able to maintain concentration and attention in two

26  hour increments on a sustained basis in a low-demand setting.  The VE, using the functional

27  capacity assessment of Dr. Levinson as set forth by the ALJ, found that there are a significant

28  number of jobs that Plaintiff could perform.  The Court does not find any legal error warranting

1    reversal, and Plaintiff's appeal of the denial of Social Security benefits is denied.

2                                              **V.**

3                            **CONCLUSION AND ORDER**

4            Based on the foregoing, the Court finds that the ALJ did not err in determining Plaintiff's

5    limitations or in determining that Plaintiff was able to perform work which was available in the

6    national economy.  Accordingly,

7            IT  IS  HEREBY  ORDERED  that  Plaintiff's  appeal  from  the  decision  of  the

8    Commissioner of Social Security is DENIED.  It is FURTHER ORDERED that judgment be

9    entered in favor of Defendant Commissioner of Social Security and against Plaintiff John V.

10   White.  The Clerk of the Court is directed to CLOSE this action.

11

12   IT IS SO ORDERED.

13

14       Dated:   **August 27, 2013**
                                                    _____
                                                    UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28